SEALED DOCUMENT PURSUANT TO E-GOVERNMENT ACT OF 2002

FILED
2007 AUG 22 P 4:00
CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: [signature] DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

SA07CR511 RF

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. |
| v. | ) | Count One: 18 U.S.C. § 371 (Conspiracy) |
| 1) JOHN COCKERHAM, JR., | ) | Count Two: 18 U.S.C. § 201 (Bribery) |
| 2) MELISSA COCKERHAM, | ) | Count Three: 18 U.S.C. § 201 (Bribery) |
| 3) CAROLYN BLAKE, A.K.A. CAROL BRADSHAW, | ) | Count Four: 18 U.S.C. § 201 (Bribery) |
| Defendants. | ) | Count Five: 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) |
| | ) | Count Six: 18 U.S.C. § 371 (Conspiracy) |
| | ) | Criminal Forfeiture 18 U.S.C. §§ 981(a)(1)(C), 982 28 U.S.C. § 2461(c) |

## INDICTMENT

The Grand Jury charges that at all times relevant to the Indictment:

## BACKGROUND

1. From at least in or about June 2004 until in our about July 2007, John Cockerham, Jr. ("COCKERHAM") was employed by the Department of Defense ("DoD") as a Major in the United States Army attached to the Army Contracting Activity, Fort Sam Houston Army Post in Texas. From on or about June 30, 2004, through late December 2005, COCKERHAM was



EXHIBIT D

deployed to Camp Arifjan, Kuwait, serving as a Contracting Officer. As an Army Officer assigned to a contracting office, COCKERHAM was responsible for soliciting and reviewing bids for DoD contracts in support of Army operations in the Middle East, including Operation Iraqi Freedom, and awarding contracts to DoD contractors to provide those goods and services.

2. COCKERHAM worked on contracts and numerous blanket purchase agreements ("BPAs"), which are indefinite delivery, indefinite quantity contract vehicles by which DoD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows the DoD to order that good or service in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. When requests are made under a BPA, they are referred to as "calls." DoD used the BPAs to purchase, among other things, bottled water destined for soldiers serving in Kuwait and Iraq. Under a BPA, the total value of the goods and services that might be called under the contract was usually capped. For bottled water, the monetary cap per contractor was $10 million.

3. Melissa Cockerham ("M. COCKERHAM") is a United States citizen married to COCKERHAM who resided at the Fort Sam Houston Army Post. While COCKERHAM was deployed to Kuwait, M. COCKERHAM visited her husband on at least two occasions.

4. Carolyn Blake ("BLAKE") is a United States citizen who lived in Sunnyvale, Texas and Kuwait City, Kuwait during the relevant time period. BLAKE is COCKERHAM's sister.

5. Co-conspirator One is a personal friend of COCKERHAM, who lived in San Antonio, Texas.

6. Co-conspirator Contractors A, B, and C provided various goods and services to

DoD, including bottled water, at Camp Arifjan, Kuwait and elsewhere. The principal of Co-conspirator Contractor B utilized multiple companies when seeking contracts from DoD.

7. Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy)**

8. Paragraphs 1-7 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

9. From in or about 2004 until in or about July 2007, in the Western District of Texas, Kuwait, the United Arab Emirates, and elsewhere, defendants

**JOHN COCKERHAM, Jr.,**
**MELISSA COCKERHAM,**
**CAROLYN BLAKE**

and others did knowingly and unlawfully combine, conspire, confederate, and agree with others known and unknown to the grand jury to:

a) knowingly and willfully defraud the United States by impairing, impeding, and defeating the lawful functions of the DoD; and

b) commit an offense against the United States, that is, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept things of value, that is, among other things, cash, in return for being influenced in the performance of official acts, including awarding

DoD contracts to the Co-conspirator Contractors and others at Camp Arifjan, Kuwait in violation of 18 U.S.C. § 201(b)(2)(A).

## THE CONSPIRACY AND ITS OBJECTS

10. It was an object of the conspiracy for COCKERHAM, M. COCKERHAM, BLAKE, Co-conspirator One and others to accept bribe payments from government contractors, to provide the payments to M. COCKERHAM, BLAKE, Co-conspirator One and others and, in return, COCKERHAM awarded DoD contracts and BPAs to the bribe payors.

## MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that COCKERHAM, M. COCKERHAM, BLAKE, Co-conspirator One and others would, among other things, do the following:

11. Award Co-conspirator Contractors and others DoD contracts, including bottled water BPAs, through a rigged bidding process, by which COCKERHAM would guarantee that a contractor would receive a contract in return for paying money to COCKERHAM.

12. Make calls on and modifications to various BPA contracts awarded to the Co-conspirator contractors in order to generate revenue for the companies.

13. Invoice DoD for goods provided and services performed under the contracts.

14. Pay cash bribe payments to COCKERHAM, M. COCKERHAM, BLAKE, Co-conspirator One, and others, calculated as either a flat fee or as a "residual" amount per unit item delivered to DoD, totalling approximately $9.6 million.

15. Deposit millions of dollars in bribe money into safe deposit boxes and bank accounts in Kuwait and Dubai in the names of M. COCKERHAM, BLAKE and others for the benefit of COCKERHAM.

16. Wire or cause the wire transfer of bribe money to bank accounts for the benefit of COCKERHAM.

**OVERT ACTS**

In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by COCKERHAM, M. COCKERHAM, BLAKE, Co-conspirator One, and others in Kuwait, the Western District of Texas and elsewhere:

17. In or about August 2004, BLAKE relocated to Kuwait City, Kuwait.

18. On or about October 1, 2004, COCKERHAM issued call modification 006201 on bottled water BPA DABM06-03-A-0045 for Co-conspirator Contractor B, providing $536,300 in additional funding.

19. On or about December 13, 2004, COCKERHAM issued call 0069 on bottled water BPA DABM06-03-A-0045 for Co-conspirator Contractor B in the amount of $625,000.

20. On or about December 27, 2004, COCKERHAM issued modification 0001 on bottled water BPA DABM06-03-A-0045 for Co-conspirator Contractor B, increasing the dollar limit of the BPA from $1,000,000 to $10,000,000.

21. On or about April 1, 2005, COCKERHAM created the award for bottled water BPA W912D1-05-A-0058, which was awarded to Co-conspirator Contractor C with a dollar limit of $10,000,000.

22. On or about May 17, 2005, COCKERHAM was involved in the award of bottled water BPA W912D1-05-A-0074 to Co-conspirator Contractor A with a dollar limit of $10,000,000.

23. On or about May 18, 2005, COCKERHAM created call 0004 on bottled water

BPA W912D1-05-A-0058 to Co-conspirator Contractor C in the amount of $1,841,428.57.

24. On or about May 25, 2005, COCKERHAM created call 0005 on bottled water BPA W912D1-05-A-0058 to Co-conspirator Contractor C in the amount of $2,762,142.86.

25. In or about May 2005, COCKERHAM created call 0006 on bottled water BPA W912D1-05-A-0058 to Co-conspirator Contractor C in the amount of $322,250.00.

26. On or about July 14, 2005, M. COCKERHAM traveled from the United States to Kuwait via Frankfurt, Germany.

27. On or about August 11, 2005, M. COCKERHAM traveled from Kuwait to the United States via Frankfurt, Germany.

28. On or about September 2, 2005, M. COCKERHAM traveled from the United States to Kuwait via Amsterdam, the Netherlands.

29. In or about September 2005, M. COCKERHAM traveled from Kuwait to Dubai with a representative of Co-conspirator Contractor B to open safe deposit boxes.

30. In or about September 2005, while in Dubai, a representative of Co-conspirator Contractor B gave M. COCKERHAM Emirati dirham and United States currency.

31. In or about September 2005, M. COCKERHAM deposited the money provided by Co-conspirator Contractor B into safe deposit boxes in Dubai.

32. On or about September 11, 2005, M. COCKERHAM traveled from Kuwait to the United States via Amsterdam, the Netherlands.

33. On or about September 15, 2005, COCKERHAM issued call 0005 on bottled water BPA W912D1-05A-0071 to Co-conspirator Contractor B in the amount of $4,603,571.43.

34. On or about September 15, 2005, COCKERHAM issued call 0006 on bottled

water BPA W912D1-05A-0071 to Co-conspirator Contractor B in the amount of $4,603,571.43.

35. On or about October 15, 2005, COCKERHAM issued call 0004 on bottled water BPA W912D1-05-A-0074 to Co-conspirator Contractor A in the amount of $1,841,428.57.

36. On or about October 15, 2005, COCKERHAM issued call 0008 on bottled water BPA W912D1-05-A-0084 to Co-conspirator Contractor C in the amount of $4,603,571.43.

37. On or about December 18, 2005, COCKERHAM issued call 0010 on bottled water BPA W912D1-05-A-0084 for Co-conspirator Contractor C in the amount of $4,963,735.71.

38. On or about December 20, 2005, COCKERHAM issued call 0011 on bottled water BPA W912D1-05-A-0084 for Co-conspirator Contractor C in the amount of $2,580,000.

39. In or about 2005, COCKERHAM created a document detailing the amounts of money he received from each of the Co-conspirator Contractors and identifying the individuals to whom the money was paid, including M. COCKERHAM, BLAKE, Co-conspirator One and others.

40. In or about 2005, BLAKE received approximately $300,000 from Co-conspirator Contractor A and approximately $2 million from Co-conspirator Contractor C.

41. In or about 2005, M. COCKERHAM received approximately $300,000 from Co-conspirator Contractor A; approximately $1 million from Co-conspirator Contractor B; and approximately $500,000 from Co-conspirator Contractor C.

42. In or about 2005, Co-conspirator One received approximately $250,000 from Co-conspirator Contractor B and approximately $1,250,000 from Co-conspirator Contractor C.

43. In a document dated April 22, 2006, BLAKE detailed the amounts of money she

received from Co-conspirator Contractors A and C, among others, using code names to identify the individuals from whom she received the money.

44. On or about May 11, 2006, Co-conspirator One sent $509,637.05 via wire transfer to a title company in San Antonio, Texas.

45. On or about May 11, 2006, Co-conspirator One purchased real property in San Antonio, Texas.

46. On or about August 17, 2006, M. COCKERHAM traveled from the United States to Dubai via Amsterdam, the Netherlands.

47. On or about August 23, 2006, M. COCKERHAM traveled from Dubai to the United States via Amsterdam, the Netherlands.

48. On or about August 23, 2006, upon her arrival in the United States, M. COCKERHAM completed a Currency and Monetary Instrument Report, declaring that she was carrying $14,000 cash into the United States from Dubai.

**(All in violation of Title 18, United States Code, Section 371.)**

**COUNT TWO**
**18 U.S.C. § 201(b)(2)(A) and (C)**
**(Bribery)**

Paragraphs 1 through 48 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged:

49. Beginning in or about June 2004 through in or about December 2006, in Kuwait and elsewhere, defendant

**JOHN COCKERHAM, Jr.**

as a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept things of value in return for being influenced in the performance of official acts and for being induced to do and omit to do acts in violation of a lawful duty; that is COCKERHAM solicited and agreed to accept, among other things, approximately $900,000 from Co-conspirator Contractor A in return for awarding DoD contracts, modifications and calls to Co-conspirator Contractor A at Camp Arifjan, Kuwait and elsewhere.

**(All in violation of Title 18, United States Code, Section 201(b)(2)(A) and (C).)**

**COUNT THREE**
**18 U.S.C. § 201(b)(2)(A) and (C)**
**(Bribery)**

Paragraphs 1 through 48 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged:

50. Beginning in or about June 2004 through in or about December 2006, in Kuwait and elsewhere, defendant

**JOHN COCKERHAM, Jr.**

as a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept things of value in return for being influenced in the performance of official acts and for being induced to do and omit to do acts in violation of a lawful duty; that is COCKERHAM solicited and agreed to accept, among other things, approximately $1,700,000 from Co-conspirator Contractor B in return for awarding DoD contracts, modifications and calls to Co-conspirator Contractor B at Camp Arifjan, Kuwait and elsewhere.

**(All in violation of Title 18, United States Code, Section 201(b)(2)(A) and (C).)**

**COUNT FOUR**
**18 U.S.C. § 201(b)(2)(A) and (C)**
**(Bribery)**

Paragraphs 1 through 48 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged:

51. Beginning in or about June 2004 through in or about December 2006, in Kuwait and elsewhere, defendant

**JOHN COCKERHAM, Jr.**

as a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept things of value in return for being influenced in the performance of official acts and for being induced to do and omit to do acts in violation of a lawful duty; that is COCKERHAM solicited and agreed to accept, among other things, approximately $3,600,000 from Co-conspirator Contractor C in return for awarding DoD contracts, modifications and calls to Co-conspirator Contractor C at Camp Arifjan, Kuwait and elsewhere.

**(All in violation of Title 18, United States Code, 201(b)(2)(A) and (C))**

**COUNT FIVE**
**18 U.S.C. § 1956(h)**
**(Money Laundering Conspiracy)**

Paragraphs 1 through 48 of this Information are incorporated by reference as if fully stated herein, and the following is further alleged:

52. From in or about June 2004 and continuing until at least in or about July 2007, the exact dates being unknown, in Kuwait, the Western District of Texas and elsewhere, defendants

**JOHN COCKERHAM, Jr.,**
**MELISSA COCKERHAM,**
**CAROLYN BLAKE**

and others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce, to wit: the transfer and delivery of millions of dollars in United States, Kuwati and Emirati currency, which in fact involved the proceeds of specified unlawful activity, to wit: bribery, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(I).

**(All in violation of Title 18, United States Code, Section 1956(h))**

**COUNT SIX**
**18 U.S.C. § 371**
**(Conspiracy to Obstruct Justice)**

Paragraphs 1 through 48 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged:

53. From in or about December 2006 until in or about July 2007, in the Western District of Texas, Kuwait, the United Arab Emirates, and elsewhere, defendants

**JOHN COCKERHAM, Jr.,**
**MELISSA COCKERHAM,**
**CAROLYN BLAKE**

and others did knowingly and unlawfully combine, conspire, confederate, and agree with others known and unknown to commit offenses against the United States, that is, to corruptly alter, destroy, mutilate, and conceal a record, document, or other object, and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and

otherwise obstruct, influence, and impede any official proceeding, and attempt to do so, all in violation of Title 18, United States Code, Section 1512(c)(1) and (2).

## OBJECT OF THE CONSPIRACY

54. It was an object of the conspiracy for COCKERHAM, M. COCKERHAM, BLAKE and others to misrepresent the source of funds, and create fraudulent loan agreements and other correspondence in an effort to legitimize the source of payments made by Co-conspirator Contractors to COCKERHAM and his assignees.

## MANNER AND MEANS OF THE CONSPIRACY

55. It was part of the conspiracy that COCKERHAM and others would, among other things, direct Co-conspirators to destroy evidence, make false representations to investigators and create fraudulent loan documents.

## OVERT ACTS

56. In or about January 2007, COCKERHAM instructed BLAKE, if questioned by investigators, to deny receiving money, to claim the money was given as a loan and to say that the money represented investments for a start-up company.

57. In or about January 2007, COCKERHAM instructed BLAKE to "get rid of everything."

58. In or about January 2007, COCKERHAM instructed Co-conspirator Contractors to deny making payments on COCKERHAM's behalf and/or to claim that the payments were loans.

59. In or about March 2007, BLAKE denied receiving the money detailed on the April 22, 2006, document she created and stated that the money represented donations to a ministry that she planned to establish.

60. In or about April 2007, M. COCKERHAM created documents indicating that monies provided by Co-conspirator Contractors A and B were loan payments.

**(All in violation of Title 18, United States Code, Section 371)**

Paragraphs 1 through 48 of this Indictment are incorporated by reference as if fully stated herein, and the following is further alleged:

**CRIMINAL FORFEITURE**

61. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), COCKERHAM, M. COCKERHAM and/or BLAKE, once convicted of Count 1 shall forfeit to the United States the following:

a. Any property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy to violate 18 U.S.C. § 201, in violation of 18 U.S.C. § 371.

b. A sum of money equal to the total amount of proceeds traceable to the conspiracy to commit violations of 18 U.S.C. § 201, in violation of 18 U.S.C. § 371, as charged in Count One, for which the defendant(s) is/are convicted.

62. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), COCKERHAM, once convicted of Counts 2, 3, and/or 4 (bribery (18 U.S.C. § 201)) shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property involved in the violation of Title 18, United States Code, Sections 201, for which the defendant is convicted, and all

property traceable to such property, including the following: 1) all money or other property that was the subject of each violation of Section 201; 2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations.

b. A sum of money equal to the total amount of money involved in each offense in violation of 18 U.S.C. § 201, as charged in Counts 2 through 4, for which the defendant is convicted.

63. Pursuant to Title 18, United States Code Section 982, COCKERHAM, M. COCKERHAM and/or BLAKE, once convicted of Count 5 (money laundering conspiracy (18 U.S.C. § 1956(h)) shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property involved in the violation of Title 18, United States Code, Section 1956(h), for which the defendant(s) is/are convicted, and all property traceable to such property, including the following: 1) all money or other property that was the subject of each violation of Section 1956(h); 2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations.

b. A sum of money equal to the total amount of money involved in each offense in violation of 18 U.S.C. § 1956(h), as charged in Count 5, for which the defendant(s) is/are convicted.

64. The property to be forfeited in connection with the convictions in Counts 1 through 5 includes $9,600,000, a portion of which may be satisfied by the forfeiture of the following assets:

a. Real property located at 1802 N. Maine Avenue, San Antonio, Texas, 78212.

b. Real property located at 111 East Locust, San Antonio, Texas, 78200.

c. Real property located at 117 East Locust, San Antonio, Texas, 78212

65. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendants shall forfeit substitute property, up to $9,600,000 if, by any act or omission of the defendants, the property described in the above paragraphs, or any portion thereof, cannot be located upon the exercise of due diligence; has been

transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

**(Criminal Forfeiture, pursuant Title 18, United States Code, Sections 981(a)(1)(C), 982(a) and Title 28, United States Code, Section 2461(c).)**

A TRUE BILL

[redacted]
FOREPERSON OF THE GRAND JURY

approved by:

WILLIAM M. WELCH II
Chief, Public Integrity Section
Criminal Division

Ann C. Brickley
Richard B. Evans
Trial Attorneys
Public Integrity Section

LISA PHELAN
Chief, Antitrust Division
Criminal Enforcement Section

Emily W. Allen
Mark W. Pletcher
Trial Attorneys
Antitrust Division

SEALED

FILED

JAN 31 2008

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ______ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 05:07-CR-00511(1) (WRF) |
| v. | ) | Count One: 18 U.S.C. § 371 (Conspiracy) |
| JOHN COCKERHAM, JR., | ) | Count Four: 18 U.S.C. § 201 (Bribery) |
| Defendant. | ) | Count Five: 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) |

**FACTUAL BASIS FOR GUILTY PLEA**

If this case were to go to trial, the United States of America, by and through the undersigned attorneys of the United States Department of Justice, Criminal Division, Public Integrity Section and the Antitrust Division, Criminal Enforcement Section, and the Defendant, **JOHN COCKERHAM, JR.**, personally and through his undersigned counsel, hereby stipulate that the government could prove the following facts beyond a reasonable doubt, pursuant to United States Sentencing Guidelines § 6A1.1 and Rule 32(C)(1) of the Federal Rules of Criminal Procedure:

1. Defendant JOHN COCKERHAM, JR. was employed by the Department of Defense ("DOD") as a Major in the United States Army attached to the Army Contracting Activity, Fort Sam Houston Army Base in Texas. From on or about June 30, 2004, through late December 2005, COCKERHAM was deployed to Camp Arifjan, Kuwait serving as a Contracting Officer. As an Army Officer assigned to a contracting office, COCKERHAM was a public official within the meaning of 18 U.S.C. 210(a)(1), responsible for soliciting and reviewing bids for DOD contracts for goods and services necessary to support Operation Iraqi

Freedom and awarding contracts to DOD contractors to provide those goods and services.

2. During the relevant period, COCKERHAM worked on contracts and numerous blanket purchase agreements ("BPAs"), which are indefinite delivery, indefinite quantity contract vehicles by which DOD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows the DOD to order that good in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. These requests are referred to as "calls." DOD used the BPAs to purchase, among other things, bottled water destined for troops in Kuwait and Iraq. Under a BPA, the total value of the goods and services that might be called under the contract was usually capped. For bottled water, the monetary cap per contractor was $10 million.

3. MELISSA COCKERHAM ("M. COCKERHAM") is a United States citizen married to COCKERHAM who resided at the Fort Sam Houston Army Post. While COCKERHAM was deployed to Kuwait, M. COCKERHAM visited her husband on at least two occasions.

4. CAROLYN BLAKE ("BLAKE") is a United States citizen who lived in Sunnyvale, Texas and Kuwait City, Kuwait during the relevant time period. BLAKE is COCKERHAM's sister.

5. Co-conspirator One is a personal friend of COCKERHAM, who lived in San Antonio, Texas.

6. Co-conspirator Contractors A, B, and C provided various goods and services to DoD, including bottled water, at Camp Arifjan, Kuwait and elsewhere. The principal of Co-conspirator Contractor B utilized multiple companies when seeking contracts from DoD.

7. Beginning in or about June 2004, and continuing until in or about December 2006, in Kuwait and elsewhere, Defendant COCKERHAM conspired with Co-Conspirator Contractors A, B and C to accept and agree to receive money and other consideration from the Co-conspirator Contractors and others, in return for being influenced in the performance of official acts and for being induced to do or omit to do acts in violation of a lawful duty.

8. Defendant COCKERHAM agreed to accept approximately $9.6 million dollars in money and other consideration from the Co-conspirator Contractors in return for using his official position to award DOD contracts, including bottled water BPAs, to the Co-conspirator Contractors.

9. Defendant COCKERHAM, during the relevant period, made calls on and modifications to various BPA contracts awarded to the Co-conspirator Contractors in order to generate revenue for the companies.

10. Defendant COCKERHAM, during the relevant period, invoiced DoD for goods provided and services performed under the contracts.

11. In return for Defendant COCKERHAM's conduct, the Co-conspirator Contractors paid cash bribe payments to COCKERHAM, M. COCKERHAM, BLAKE, Co-conspirator One, and others, calculated as either a flat fee or as a "residual" amount per unit item delivered to DoD, totalling approximately $9.6 million.

12. Defendant COCKERHAM caused the bribe proceeds to be deposited into safe deposit boxes and bank accounts in Kuwait and Dubai in the names of M. COCKERHAM, BLAKE and others for the benefit of defendant COCKERHAM in order to conceal and disguise the nature, location, source, ownership and control of the bribe proceeds.

13. Defendant COCKERHAM also caused the bribe proceeds to be wire transferred to bank accounts for the benefit of defendant COCKERHAM in order to conceal and disguise the nature, location, source, ownership and control of the bribe proceeds.

14. In or about September 2005, while in Dubai, a representative of Co-conspirator Contractor B gave M. COCKERHAM approximately one million Emirati dirham.

15. In or about September 2005, M. COCKERHAM deposited the Emirati dirham as well as United States currency into safe deposit boxes in Dubai.

16. In or about 2005, COCKERHAM created a document detailing the amounts of money he received from each of the Co-conspirator Contractors and identifying the individuals to whom the money was paid, including M. COCKERHAM, BLAKE, Co-conspirator One and others.

17. In or about 2005, M. COCKERHAM received approximately $300,000 from Co-conspirator Contractor A; approximately $1 million from Co-conspirator Contractor B; and approximately $500,000 from Co-conspirator Contractor C.

18. In or about 2005, Co-conspirator One received approximately $250,000 from Co-conspirator Contractor B and $1,250,000 from Co-conspirator Contractor C.

19. On or about May 11, 2006, Co-conspirator One sent $509,637.05 via wire transfer to a title company in San Antonio, Texas.

20. On or about May 11, 2006, Co-conspirator One purchased real property in San Antonio, Texas.

21. In or about April 2007, Defendant COCKERHAM and M. COCKERHAM created documents indicating that monies provided by Co-conspirator Contractors A and B were

loan payments as a nature of disguising the true nature of the payments.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I am competent to make this statement and I do so knowingly and voluntarily and because I am in fact guilty of the crimes charged. I have discussed this factual basis with my attorneys, and I understand that under the terms of the plea agreement this statement is admissible as evidence against me if my plea of guilty is not entered or if I otherwise fail to comply with the plea agreement.

DATE: 2/1/08

John Cockerham, Jr.

Jimmy Parks, Jr., Esq.
Attorney for Defendant

**For the United States**

LISA M. PHELAN, Chief
National Criminal Enforcement Section
Antitrust Division

By:
Mark W. Pletcher, Trial Attorney
Emily W. Allen, Trial Attorney
National Criminal Enforcement Section
United States Department of Justice
Antitrust Division
1401 H Street, NW; Suite 3700
Washington, DC 20005

WILLIAM M. WELCH II, Chief
Public Integrity Section
Criminal Division

By:
Ann C. Brickley, Trial Attorney
Richard B. Evans, Trial Attorney
Public Integrity Section
United States Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, DC 20005

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. |
| | ) | |
| | ) | Count One: 18 U.S.C. § 371 (Conspiracy) |
| v. | ) | |
| | ) | |
| | ) | Count Two: 18 U.S.C. § 201 (Bribery) |
| JAMES MOMON, JR. | ) | |
| | ) | |
| Defendant. | ) | Count Three: 18 U.S.C. § 201 (Bribery) |
| | ) | |

# INFORMATION

The United States charges:

## COUNT ONE
## 18 U.S.C. § 371
## (Conspiracy)

At all relevant times:

1. Beginning at least on or about September 21, 2005, and continuing until at least on or about November 14, 2007, the exact dates being unknown, in Kuwait and elsewhere, Defendant

**JAMES MOMON, JR.**

and others did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with others known and unknown to violate a statute of the United States, namely 18 U.S.C. § 201 (bribery), by, among other things, directly and indirectly, corruptly seeking, receiving, accepting, and agreeing to receive and accept items of value in return for being influenced in the performance of official acts, including the award of Department of Defense ("DOD") contracts

EXHIBIT
E

and blanket purchase agreement ("BPA") calls for bottled water, waste water removal, and other goods and services to co-conspirator government contractors. The unlawful scheme was executed through overt acts taken by MOMON and his co-conspirators.

## BACKGROUND

2. For the purposes of this Criminal Information, the "relevant period" is that period from at least on or about September 21, 2005, until at least on or about November 14, 2007. From on or about September 21, 2005, until on or about August 10, 2006, the Defendant was a Major with the United States Army deployed to Camp Arifjan, Kuwait, as a Contracting Officer. As an Army officer, MOMON was a public official within the meaning of 18 U.S.C. § 201(a)(1).

3. As a Contracting Officer, MOMON worked on contracts and numerous BPAs, which are indefinite delivery, indefinite quantity procurement vehicles by which DOD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows DOD to order that good or service in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. Requests made under a BPA are referred to as "calls." DOD used BPAs to purchase, among other things, bottled water destined for soldiers serving in Kuwait and Iraq and waste water removal service from Camp Arifjan and other United States military bases in Kuwait. While MOMON was deployed to Kuwait, he made numerous calls on BPAs held by co-conspirator contractors, obligating DOD to pay millions of dollars for goods and services delivered under those calls.

4. Co-conspirator Contractors One, Two, Three, Four, and Five each operate businesses in Kuwait that contract with DOD. During the relevant period, Co-conspirator Contractors One, Three, Four, and Five each held BPAs for the supply of bottled water. During

the relevant period, Co-conspirator Contractor Two held a BPA for, among other things, the removal of waste water from Camp Arifjan and other United States military bases in Kuwait.

5. Person A, Person B, and Person C are United States military officials who were deployed to Camp Arifjan, Kuwait, and at various times worked at the Camp Arifjan contracting office. MOMON assumed duties from Person A in or around December 2005, when Person A was redeployed to the United States.

THE CONSPIRACY AND ITS OBJECTS

6. Beginning at least on or about September 21, 2005, and continuing until at least on or about November 14, 2007, in Kuwait and elsewhere, MOMON did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with others known and unknown to, directly and indirectly, corruptly seek, receive, accept, and agree to receive and accept something of value from Co-conspirator Contractors in return for being influenced in the performance of official acts; that is, MOMON agreed to receive and accept approximately $5.8 million, of which he in fact sought, received, and accepted approximately $1.6 million, from Co-conspirator Contractors in return for awarding BPA calls and contracts to Co-conspirator Contractors, in violation of 18 U.S.C. § 201.

7. The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among MOMON and his co-conspirators, the substantial terms of which were to obtain DOD contracts in return for bribes paid to United States military officers.

MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that MOMON and his co-conspirators would, among other things, do the following:

8. Agree to pay MOMON a designated amount of money, on a per-case, per-gallon, or per-contract basis, for BPA calls and contracts MOMON would award.

9. Award BPA calls and contracts to Co-conspirator Contractors, including calls for bottled water, waste water removal, and other goods and services.

10. Invoice DOD for goods delivered and services provided under the BPA calls and contracts and receive payment from DOD based on these invoices.

11. Remit payments, in the form of money and other things of value, to MOMON and others, in return for official acts awarding BPA calls and contracts to Co-conspirator Contractors.

## OVERT ACTS

In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by MOMON or one or more of his co-conspirators in Kuwait and elsewhere:

12. In or around October 2005, MOMON, Person A, and Person B met in Person A's car to discuss opportunities identified by Person A and Person B for personal profit from contracting actions. During this meeting, Person A and Person B explained to MOMON how to hide those profits in foreign bank accounts and sham companies.

13. In or around October and November 2005, at the Camp Arifjan dining facility and elsewhere, Person A described to MOMON and Person C how to hide illegal contracting actions from auditors and law enforcement.

14. In or around November and December 2005, Person A introduced MOMON to Co-conspirator Contractors from whom Person A had received bribes. MOMON and Person A intended for MOMON to take Person A's place in receiving bribes from these Co-conspirator

Contractors when Person A left Arifjan in December 2005.

A. Co-conspirator Contractor One

15. In or around November 2005, MOMON, Person A, and Co-conspirator Contractor One met to discuss an arrangement by which Co-conspirator Contractor One agreed to pay MOMON approximately $0.50 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor One's companies. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries.

16. From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor One's company's BPA number W912D1-05-A-0036 obligating DOD to a total payment of at least $8 million.

17. In or around January 2006, Co-conspirator Contractor One arranged for a corporation named Omega Construction and Support Services to be registered in the United States. The purpose of this company was to provide a means to funnel bribe payments to MOMON without detection.

18. In or around February 2006, Co-conspirator Contractor One arranged for two Philippine Islands bank accounts to be opened, one for the benefit and use of MOMON and one for the benefit and use of Person C. MOMON and Co-conspirator Contractor One intended to use MOMON's account to receive bribe payments.

19. In or around February 2006, Co-conspirator Contractor One delivered to MOMON and Person C two ATM cards with access to each Philippine Islands bank account. In or around March 2006, MOMON and Person C attempted unsuccessfully to use those ATM cards to withdraw cash from the accounts.

20. On or around March 28, 2006, Co-conspirator Contractor One met MOMON at Hartsfield-Jackson Atlanta International Airport and paid MOMON $100,000 cash as partial payment for bottled water BPA calls made by MOMON.

21. In or around July 2006, Co-conspirator Contractor One met MOMON in Kuwait and paid him $100,000 cash as partial payment for bottled water BPA calls made by MOMON.

22. In or around July 2006, MOMON delivered some portion of the cash proceeds he received from Co-conspirator Contractor One to the Kuwait home of MOMON's associate, Person D, for safekeeping.

B. Co-conspirator Contractor Two

23. In or around November 2005, MOMON and Co-conspirator Contractor Two met to discuss an arrangement by which Co-conspirator Contractor Two agreed to pay MOMON a fixed rate of approximately three cents per gallon of waste water removed from Camp Arifjan pursuant to BPA calls MOMON would place on behalf of Co-Conspirator Contractor Two's company.

24. From in or around January 2006 to in or around March 2006, BPA calls were issued for waste water removal under Co-conspirator Contractor Two's BPA number W912D1-05-A-0063 obligating DOD to a total payment of at least $3 million.

25. In or around March 2006, Co-conspirator Contractor Two had approximately $100,000 cash paid into an account controlled by Co-conspirator Contractor One, at MOMON's request, as partial payment for waste water removal BPA calls made by MOMON.

26. On or about March 29, 2006, Co-conspirator Contractor One wired approximately $110,000 from the receiving account paid by Co-conspirator Contractor Two into the Philippine

Islands bank account designated for MOMON.

27. In or around March 2006, Co-conspirator Contractor Two had $400,000 cash delivered to MOMON as partial payment for waste water removal BPA calls made by MOMON.

C. Co-conspirator Contractor Three

28. In or around December 2005, MOMON, Person A, Co-conspirator Contractor Three, and others met to discuss an arrangement by which Co-conspirator Contractor Three agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor Three's company. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries. Co-conspirator Contractor Three gave MOMON $10,000 cash to secure the arrangement.

29. From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Three's BPA number W912D1-05-A-0074 obligating DOD to a total payment of at least $4 million.

D. Co-conspirator Contractor Four—Bottled Water Contract

30. In or around December 2005, MOMON, Person A, Co-conspirator Contractor Four, and others met to discuss an arrangement by which Co-conspirator Contractor Four agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-Conspirator Contractor Four's company. Person A expected to receive 50% of MOMON's earnings from these bottled water deliveries.

31. From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Four's BPA number W912D1-05-A-0084 obligating DOD to a total payment of at least $15 million.

32. In or around July 2006, as MOMON prepared to leave Kuwait, Co-conspirator Contractor Four had $800,000 cash delivered to MOMON as partial payment for bottled water BPA calls made by MOMON.

33. In or around July 2006, MOMON delivered some portion of the cash proceeds he received from Co-conspirator Contractor Four to the Kuwait home of Person D.

E. Co-conspirator Contractor Four—Lightset Contract

34. In or around December 2005, MOMON, Co-conspirator Contractor Four, Person A, Person C, and others met to discuss an arrangement by which Co-conspirator Contractor Four agreed to pay MOMON ten percent of the value of a lightset contract MOMON would arrange to be awarded to Co-Conspirator Contractor Four's company.

35. On January 12, 2006, lightset contract number W912D1-06-P-0281 was awarded to Co-Conspirator Contractor Four's company in the amount of $847,980.

36. In or around March 2006, Co-conspirator Contractor Four had $80,000 cash delivered to MOMON in return for the award of the lightset contract.

F. Co-conspirator Contractor Five

37. In or around January 2006, MOMON and Co-conspirator Contractor Five met to discuss an arrangement by which Co-conspirator Contractor Five agreed to pay MOMON approximately $1.00 per case of bottled water delivered pursuant to BPA calls MOMON would place on behalf of Co-conspirator Contractor Five's company.

38. From in or around January 2006 to in or around July 2006, BPA calls were issued for bottled water deliveries under Co-conspirator Contractor Five's BPA number W912D1-05-A-0071 obligating DOD to a total payment of at least $20 million.

39. In or around August 2006, as MOMON prepared to leave his tour in Kuwait, Co-conspirator Contractor Five showed MOMON a spreadsheet detailing approximately $4.2 million owed to MOMON for calls under BPA number W912D1-05-A-0071, which Co-conspirator Contractor Five agreed to pay MOMON when he left military service.

**(All in violation of Title 18, United States Code, Section 371, and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

**COUNT TWO**
**18 U.S.C. § 201**
**(Bribery)**

Paragraphs 2 through 39 of this Information are incorporated by reference as if fully stated herein, and the following is further alleged:

40. Beginning at least in or about October 2005, and continuing until at least on or about August 10, 2006, the exact dates being unknown, in Kuwait and elsewhere, Defendant

**JAMES MOMON, JR.**

a public official, directly and indirectly did corruptly seek, receive, accept, and agree to receive and accept something of value in return for being influenced in the performance of official acts; that is MOMON sought, received, accepted, and agreed to receive and accept items of value, totaling approximately $200,000 cash, from Co-conspirator Contractor One in return for the award of bottled water BPA calls to Co-conspirator Contractor One's companies.

**(All in violation of Title 18, United States Code, Section 201(b)(2), and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

**COUNT THREE**
**18 U.S.C. § 201**
**(Bribery)**

Paragraphs 2 through 39 of this Information are incorporated by reference as if fully

stated herein, and the following is further alleged:

41. Beginning at least in or about October 2005, and continuing until at least in or about August 10, 2006, the exact dates being unknown, in Kuwait and elsewhere, Defendant

**JAMES MOMON, JR.**

a public official, directly and indirectly did corruptly seek, receive, accept, and agree to receive and accept something of value in return for being influenced in the performance of official acts; that is MOMON sought, received, accepted, and agreed to receive and accept items of value, totaling approximately $800,000 cash, from Co-conspirator Contractor Four in return for the award of bottled water BPA calls to Co-conspirator Contractor Four's company.

**(All in violation of Title 18, United States Code, Section 201(b)(2), and pursuant to the extraterritorial venue provision, Title 18, United States Code, Section 3238.)**

DATED: June 25, 2008, at Washington, D.C.

ON BEHALF OF THE UNITED STATES,

LISA M. PHELAN, Chief
National Criminal Enforcement Section
Antitrust Division

By: [signature]
EMILY W. ALLEN
MARK W. PLETCHER
FINNUALA KELLEHER
Trial Attorneys
United States Department of Justice
450 5th Street NW, Suite 11300
Washington, DC 20005
(202) 307-0946
emily.allen@usdoj.gov
mark.pletcher@usdoj.gov
finnuala.kelleher@usdoj.gov

WILLIAM M. WELCH II, Chief
Public Integrity Section
Criminal Division

By: Peter C. Sprung
PETER C. SPRUNG
ANNALOU TIROL

Trial Attorneys
United States Department of Justice
1400 New York Ave., NW, 12th Floor
Washington, DC 20005
(202) 514-1412
peter.sprung@usdoj.gov
annalou.tirol@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. CR-08-187 |
| v. | Count One: 18 U.S.C. § 371 (Conspiracy) |
| JAMES MOMON, JR. | Count Two: 18 U.S.C. § 201 (Bribery) |
| Defendant. | Count Three: 18 U.S.C. § 201 (Bribery) |

FILED
JUN 26 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, the United States of America and the Defendant, JAMES MOMON, JR., agree as follows:

**Plea and Maximum Sentence**

1. The Defendant is entering into this Plea Agreement and is pleading guilty freely and voluntarily without promise or benefit of any kind, other than contained herein, and without threats, force, intimidation, or coercion of any kind. The Defendant knowingly, voluntarily, and truthfully admits the facts contained herein as set forth in Paragraph 7 and in the attached Information, which is incorporated herein by reference.

2. The Defendant agrees to plead guilty to a three-count Information charging him with one count of conspiracy in violation of 18 U.S.C. § 371 and two counts of bribery in violation of 18 U.S.C. § 201. The Defendant admits that he is guilty of these crimes, that he is pleading guilty because he is guilty, and that he understands that he will be adjudicated guilty of these offenses.

3. The Defendant understands the nature of the offenses to which he is pleading

guilty and the elements thereof, including the penalties provided by law. The maximum penalties for Count 1 charging him with a violation of 18 U.S.C. § 371 are five (5) years of imprisonment and a fine of $250,000; the maximum penalties for Counts 2 and 3 charging him with a violation of 18 U.S.C. § 201 are 15 years of imprisonment and a fine of $250,000 or not more than three times the monetary equivalent of the thing of value. The Defendant also understands that the Court may impose a term of supervised release to follow any incarceration in accordance with 18 U.S.C. § 3583, and that, in this case, the authorized term of supervised release is at least two years but not more than three years. The Defendant also understands that the Court may order him to pay restitution to the victims and the costs of his incarceration and supervision, and that he will be required to pay a mandatory special assessment of $100 per count of conviction.

4. If the Court accepts the Defendant's pleas of guilty, and the Defendant fulfills each of the terms and conditions of this Plea Agreement, the United States agrees that it will not further prosecute the Defendant for crimes arising from the facts set forth in Paragraph 7, in the Information, or for crimes disclosed to the United States during briefings conducted pursuant to this agreement. This paragraph does not apply to any "crimes of violence," as that term is defined by 18 U.S.C. § 16, or to any offenses which the Defendant failed to disclose fully to the United States. The Defendant also understands that this Plea Agreement affects only criminal charges and shall not be construed, in whole or in any part, as a waiver, settlement, or compromise of any civil or administrative remedies available to any agency or department of the United States or any state or local government.

5. The Defendant agrees that if the Court does not accept his pleas of guilty, this Plea Agreement shall be null and void.

**Advice of Rights**

6. The Defendant, having been advised of his constitutional rights, including his right to a trial by jury, his right to confront and cross-examine witnesses against him, his right to testify if he so chooses and to call witnesses on his behalf, his right to be represented by an attorney at every stage of the proceedings against him, his privilege against self-incrimination, his right to appeal his conviction, if he is found guilty, and his right to appeal the imposition of sentence against him, knowingly and voluntarily waives these rights and privileges and agrees to enter the pleas of guilty as set forth in this Plea Agreement.

**Factual Basis for Offenses Charged**

7. Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:

(a) For purposes of this Plea Agreement, the relevant period is that period from at least on or about September 21, 2005, until at least on or about November 14, 2007. From on or about September 21, 2005, until on or about August 10, 2006, the Defendant was a Major with the United States Army deployed to Camp Arifjan, Kuwait, as a Contracting Officer. As an Army officer, the Defendant was a public official within the meaning of 18 U.S.C. § 201(a)(1).

(b) As a Contracting Officer, the Defendant worked on contracts and numerous BPAs, which are indefinite delivery, indefinite quantity procurement vehicles by which DOD agrees to pay a contractor a specified price for a particular good or service. The BPA then allows the DOD to order that good or service in whatever quantity, and the contractor is bound by the price agreed upon in the BPA. Requests made under a BPA are referred to as "calls." DOD used BPAs to purchase, among other

things, bottled water destined for soldiers serving in Kuwait and Iraq and waste water removal service from Camp Arifjan and other United States military bases in Kuwait. While the Defendant was deployed to Kuwait, he made numerous calls on BPAs held by co-conspirator contractors, obligating DOD to pay millions of dollars for goods and services delivered under those calls.

(c) Co-conspirator Contractors One, Two, Three, Four, and Five each operate businesses in Kuwait that contract with DOD. During the relevant period, Co-conspirator Contractors One, Three, Four, and Five each held BPAs for the supply of bottled water. During the relevant period, Co-conspirator Contractor Two held a BPA for, among other things, the removal of waste water from Camp Arifjan and other United States military bases in Kuwait.

(d) During the relevant period, the Defendant conspired with others known and unknown to, directly and indirectly, corruptly seek, receive, accept, and agree to receive and accept money and other things of value in return for being influenced in the performance of official acts. Beginning at least on or around September 21, 2005, and continuing until at least on or around November 14, 2007, the Defendant sought, received, accepted, and agreed to receive and accept cash payments and other things of value from the Co-conspirator Contractors in return for his official acts awarding BPA calls and contracts to those Co-conspirator Contractors. The unlawful scheme was executed through overt acts taken by the Defendant and his co-conspirators.

(e) During the relevant period, the Defendant, as a public official, directly and indirectly corruptly sought, received, accepted, and agreed to receive and accept things of value in return for being influenced in the performance of official acts. In return for his

official acts awarding bottled water BPA calls to Co-conspirator Contractor One's companies, the Defendant sought, received, accepted, and agreed to receive and accept approximately $200,000 cash from Co-conspirator Contractor One.

(f) During the relevant period, the Defendant, as a public official, directly and indirectly corruptly sought, received, accepted, and agreed to receive and accept things of value in return for being influenced in the performance of official acts. In return for his official acts awarding bottled water BPA calls to Co-conspirator Contractor Four's company, the Defendant sought, received, accepted, and agreed to receive and accept approximately $800,000 cash from Co-conspirator Contractor Four.

(g) During the relevant period, the Defendant, as a public official with DOD, accepted more than one bribe from Co-conspirator Contractors in return for being influenced in the performance of official acts. During the relevant period, the Defendant in fact received and accepted approximately $1.6 million.

**Sentencing Guidelines and Sentencing Factors**

8. The parties agree that the Defendant's sentencing is governed by the November 2007 United States Sentencing Guidelines, and that the controlling Guideline applicable to the offenses to which the Defendant is pleading guilty is U.S.S.G. § 2C1.1. The parties agree that Counts 1, 2 and 3 group pursuant to U.S.S.G. § 3D1.2. The parties agree to recommend the following Guideline calculations:

2C1.1(a)(1) Base Offense Level .................................... 14

2C1.1(b)(1) Offense Involved More than One Bribe ...................... 2

2C1.1(b)(2) & 2B1.1(b)(1)(H) Value of Payment More than

$1,000,000 and less than $2,500,000 .......................... 16

TOTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

9. In the event the United States learns of information between the date of this Plea Agreement and the date of sentencing that, together with the information currently in the possession of the United States, persuades the United States that such an adjustment would be appropriate, the United States reserves the right to argue for the application of a 2-level adjustment under U.S.S.G. § 3C1.1, Obstructing and Impeding the Administration of Justice. The Defendant reserves his right to oppose any such adjustment.

10. The Defendant understands that his Criminal History Category will be determined by the Court after the completion of a Pre-Sentence Investigation report by the U.S. Probation Office. Should the Defendant comply fully with his obligations under this Plea Agreement, the United States will, based on information available as of the date of this Plea Agreement and subject to satisfactory debriefings at which the Defendant is entirely truthful and fully accepts responsibility for his criminal conduct and continues to accept responsibility for his criminal conduct up to and including the sentencing date, recommend a downward adjustment of two (2) levels for acceptance of responsibility under U.S.S.G. § 3E1.1, or three (3) levels for acceptance of responsibility under U.S.S.G. § 3E1.1 in the event it is determined that his total offense level is 16 or higher. The United States, however, will not be required to make these recommendations if any of the following occurs: (1) the Defendant fails or refuses to make a full, accurate and complete disclosure to this office or the probation office of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) the Defendant is found to have misrepresented facts to the United States prior to entering this Plea Agreement; (3) the Defendant commits any misconduct after entering into this Plea Agreement, including but not limited to, committing a state or federal offense, violating any term of release, or making false

statements or misrepresentations to any governmental entity or official; or (4) the Defendant fails to comply with any terms of this Plea Agreement. The parties agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines justifying a departure pursuant to U.S.S.G. §5K2.0.

11. The Defendant understands and agrees that federal sentencing law requires the Court to impose a sentence which is reasonable and that the Court must consider the advisory U.S. Sentencing Guidelines in effect at the time of the sentencing in determining a reasonable sentence. The Defendant also understands that sentencing is within the discretion of the Court and that the Court is not bound by this Plea Agreement. The Defendant understands that the facts that determine the offense level will be found by the Court at sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as provisions or stipulations in this Plea Agreement. Both parties agree to recommend that the Sentencing Guidelines should apply pursuant to *United States v. Booker* and that they, along with the other factors set forth under 18 U.S.C. § 3553, provide a fair and just resolution based upon the facts of this case. The Defendant also states that he has had ample opportunity to discuss, and has in fact discussed, the impact of the sentencing guidelines and the statutory maximum sentence with his attorney and is satisfied with his attorney's advice in this case.

12. The Defendant acknowledges that the Court has not yet determined a sentence and that any estimate of a probable sentencing range under the Guidelines that the Defendant may have received, or may receive in the future, from his counsel, the United States, or the Probation Office is a prediction, not a promise, and it is not binding on the Probation Office or the Court. The United States makes no promise or representation concerning the sentence that the

Defendant will receive. The parties understand that the final determination concerning sentencing rests within the sole discretion of the Court. If the Court imposes a sentence with which the Defendant is not satisfied, he will not be permitted to withdraw any guilty plea for that reason nor will he be permitted to withdraw his plea should the Court decline to follow any recommendations by, or stipulations of, the parties.

**Agreement to Cooperate**

13. The Defendant agrees to provide entirely truthful, complete and accurate information, and he agrees to cooperate fully with the United States. This cooperation shall include, but is not limited to, the following:

(a) The Defendant agrees to be fully debriefed and to attend all meetings, at his own expense, at which his presence is requested, concerning his participation in, and knowledge of, all criminal activities;

(b) The Defendant agrees to withdraw any assertions of privilege and to provide to the United States all documents and other items or material that may be relevant to the investigation and that are in the Defendant's possession, custody or control;

(c) The Defendant agrees to waive any privilege that he may have in connection with interviews of, and testimony by, attorney witnesses with information of, or related to, criminal conduct in which he participated or of which he has knowledge. Such waiver does not extend to counsel who now represents the Defendant, in connection with the defense of this criminal matter;

(d) The Defendant shall not reveal his cooperation, or any information derived

therefrom, to any person other than his attorney of record in this criminal case without the prior consent of the United States; and

(e) The Defendant agrees to testify truthfully at any proceeding in the District of Columbia or elsewhere as requested by the United States.

14. The United States agrees that, pursuant to U.S.S.G. § 1B1.8, no information provided by the Defendant in debriefings or testimony conducted after the date of, and pursuant to, this plea agreement will be used against him in this case in determining the applicable guideline range for sentencing or as a basis for an upward departure.

15. The Defendant agrees that the United States may meet with and debrief him without the presence of his attorney, unless the Defendant specifically requests his attorney's presence at such debriefings and meetings. Upon request of the Defendant, the United States will endeavor to provide reasonable advance notice to counsel of the date, place, and time of meetings and debriefings, it being understood that the United States's ability to provide such notice may vary according to time constraints and other circumstances. The United States will accommodate reasonable requests to alter the time and place of such debriefings. It is understood, however, that any cancellations or rescheduling of debriefings or meetings requested by the Defendant that hinder the United States's ability to prepare adequately for trials, hearings or other proceedings may adversely affect the Defendant's ability to provide substantial assistance. Matters occurring at any meeting or debriefing may be considered by the United States in its determination of whether the Defendant has provided substantial assistance or otherwise complied with the letter and spirit of this Plea Agreement, and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

16. The United States agrees to consider the nature and extent of the Defendant's cooperation in determining whether he has provided substantial assistance to law enforcement authorities pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). The Defendant acknowledges that the determination of whether he has provided substantial assistance is a decision solely within the discretion of the United States, and the Defendant agrees not to contest that determination. If the United States concludes that the Defendant has provided substantial assistance to law enforcement authorities pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), the United States will file a motion for a downward departure. If such a motion is filed, the United States has the right to make a specific recommendation to the sentencing Court regarding the number of offense levels the Court should depart downward in fashioning an appropriate sentence, and the United States will also advise the Court of the full nature, extent and timing of the Defendant's cooperation.

**No Protection for False Statements or Future Criminal Conduct—
Breach of Plea Agreement**

17. The Defendant shall at all times give complete, truthful and accurate information and testimony, and he agrees not to commit, or attempt to commit, any further crimes. The Defendant understands that this Plea Agreement does not protect him from prosecution for perjury, should he testify untruthfully at any proceeding, or for making false statements in connection with interviews conducted pursuant to this Plea Agreement or any other statements or testimony on or after the date of this Plea Agreement. If it is determined that he has failed to provide such complete, truthful and accurate information, the Plea Agreement is voidable at the election of the United States and the United States is no longer bound by the loss or restitution stipulations. Nor does this Plea Agreement protect him from prosecution for other crimes or

offenses as to which he does not make full admission and give truthful and complete information. Further, should the Defendant fail to comply with the terms and conditions set forth in this Plea Agreement, the United States may fully prosecute the Defendant on all criminal charges that can be brought against the Defendant. With respect to such a prosecution:

(a) The Defendant shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the Defendant's statements pursuant to this Plea Agreement or any leads derived therefrom should be suppressed or are inadmissible;

(b) The Defendant waives any right to claim that evidence presented in such prosecution is tainted by virtue of the statements the Defendant has made; and

(c) The Defendant waives any and all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this Plea Agreement is signed by the parties.

18. In the event of a dispute as to whether the Defendant has knowingly committed a breach of this Plea Agreement, and if the United States chooses to exercise its rights under the preceding paragraph, and if the Defendant so requests, the matter shall be submitted to the Court and shall be determined by the Court in an appropriate proceeding at which the Defendant's disclosures and documents shall be admissible and at which time the United States shall have the burden to establish the Defendant's breach by a preponderance of the evidence.

**Venue**

19. The Defendant agrees, for purposes of entering his pleas of guilty, sentencing and

all other appropriate proceedings relevant to the filing of this Plea Agreement, to consent to the jurisdiction of the United States District Court for the District of Columbia. The Defendant expressly waives his right to object to venue in the District of Columbia.

**Waiver of Right to Appeal**

20. The Defendant, knowing and understanding the facts set forth herein and in the Information, including the maximum possible penalty that could be imposed, and knowing and understanding his right to appeal his conviction and the sentence imposed as provided in 18 U.S.C. § 3742, hereby expressly waives the right to appeal his conviction or any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever, in exchange for the concessions made by the United States in this Plea Agreement. The Defendant also knowingly and voluntarily waives his right to challenge his conviction, the sentence imposed, or the manner in which the sentence was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This Plea Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).

**Right of Allocution**

21. The United States reserves the right to allocute as to the nature and seriousness of the offense and to make a recommendation as to sentencing. The attorneys for the United States will inform the Court and the Probation Office of: (1) this Plea Agreement; (2) the nature and extent of the Defendant's activities with respect to this case; and (3) all other information in its possession relevant to sentencing.

**Duplicity Waiver**

22. The Defendant agrees to waive any objection or defense he might have based on the United States joining in a single count, as set forth in Counts Two and Three of the Information, multiple distinct and separate offenses of bribery. The Defendant understands that this waiver is knowingly and voluntarily made after fully conferring with, and on the advice of, his counsel.

**Non-binding on Non-parties**

23. The Defendant understands that this Plea Agreement binds and limits in any manner only the United States, defined as the United States Department of Justice, Antitrust Division, National Criminal Enforcement Section, and Criminal Division, Public Integrity Section. This Plea Agreement does not bind any United States Attorney's Office, nor does it bind any state or local prosecutor. It also does not bar or compromise any civil or administrative claim pending or that may be made against the Defendant. If requested, however, National Criminal Enforcement Section and the Public Integrity Section will bring this Plea Agreement to the attention of any other prosecuting jurisdiction and ask that jurisdiction to abide by the provisions of this Plea Agreement. The Defendant understands that other prosecuting jurisdictions retain discretion over whether to abide by the provisions of this Plea Agreement.

**Restitution**

24. Pursuant to 18 U.S.C. § 3663A, the Defendant understands and agrees that restitution to victims of this offense is mandatory. The parties agree that the victim of this offense is the Department of Defense. The loss to the victim is estimated to be approximately $5.8 million, representing the presently known bribe payments received by and promised to the

Defendant for all contracts and BPA calls fraudulently awarded in Iraq and Kuwait as the result of the conspiracy and bribery offenses charged in Counts One, Two and Three in the Information. The Defendant agrees that his restitution obligation shall be joint and several with any other defendants ultimately convicted in this matter, if any, but that the Court may apportion liability among defendants, pursuant to the procedures set forth in 18 U.S.C. § 3664(h), to reflect the level of contribution to the victims' losses and economic circumstances of each defendant. The parties understand that the Defendant is entitled to argue for offsets based on the amounts paid or agreed to be paid to the victim by potentially responsible parties. The Defendant agrees not to transfer or otherwise encumber his assets except with notice to, and consent of, the undersigned representatives of the United States until such time as this Plea Agreement is filed with the Court, at which point the Defendant must seek leave of Court to transfer or otherwise encumber his assets. The parties agree that the Defendant will not be required to obtain the consent of the United States for property transfers necessary to pay ordinary living expenses and ordinary business expenses and attorneys' fees. The Defendant agrees as part of this Plea Agreement that he will provide to the United States detailed financial information about all income and expenses on a monthly basis and as requested.

**No Additional Agreements**

25. No promises, agreements, or conditions have been entered into other than those expressly set forth in this Plea Agreement, and none shall be entered into or are binding upon the Defendant and the United States unless expressly set forth in writing, signed by all parties and physically attached to this Plea Agreement. This Plea Agreement supersedes any prior promises, agreements or conditions between the United States and the Defendant.

**Acknowledgments**

**The Defendant**

I, James Momon, Jr., hereby expressly acknowledge the following: (1) that I have read this entire Plea Agreement; (2) that I have had an opportunity to discuss this Plea Agreement fully and freely with my attorney; (3) that I fully and completely understand each and every one of its terms; (4) that I am fully satisfied with the advice and representation provided to me by my attorney; and (5) that I have signed this Plea Agreement knowingly, freely and voluntarily.

6/12/08
DATE

James Momon, Jr.

**Counsel for the Defendant**

I, J. Burkhardt Beale, Esq., attorney for James Momon, Jr., hereby expressly acknowledge the following: (1) that I have discussed this Plea Agreement with my client; (2) that I have fully explained each one of its terms to my client; (3) that I have fully answered each and every question put to me by my client regarding the Plea Agreement; and (4) in my opinion, my client completely understands the letter and spirit of all of the Plea Agreement's terms.

6/12/08
DATE

J. Burkhardt Beale, Esq.

ON BEHALF OF THE UNITED STATES,

LISA M. PHELAN, Chief
National Criminal Enforcement Section
Antitrust Division

By: ______________________
EMILY W. ALLEN
MARK W. PLETCHER
FINNUALA KELLEHER
Trial Attorneys
United States Department of Justice
Antitrust Division
National Criminal Enforcement Section
450 5th Street NW, Suite 11300
Washington, DC 20005
(202) 307-0946
emily.allen@usdoj.gov
mark.pletcher@usdoj.gov
finnuala.kelleher@usdoj.gov

WILLIAM M. WELCH II, Chief
Public Integrity Section
Criminal Division

By: Peter C. Sprung
PETER C. SPRUNG
ANNALOU TIROL

Trial Attorneys
United States Department of Justice
Criminal Division
Public Integrity Section
1400 New York Ave., NW, 12th Floor
Washington, DC 20005
(202) 514-1412
peter.sprung@usdoj.gov
annalou.tirol@usdoj.gov